UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
KAREN A. ALMESTICA,

                                  Plaintiff,              **MEMORANDUM & ORDER**

     -against-

                                                    15-CV-6312 (DRH)

CAROLYN W. COLVIN, Commissioner
of Social Security,

                                   Defendant.
-------------------------------------------------------X

**APPEARANCES:**

**LAW OFFICE OF HARRY J. BINDER AND CHARLES E. BINDER, P.C.**
60 East 42nd Street, Suite 520
New York, New York 10165
By: Charles E. Binder, Esq.

**ROBERT L. CAPERS**
**UNITED STATES ATTORNEY, EASTERN DISTRICT OF NEW YORK**
Attorney for Defendant
271-A Cadman Plaza East
Brooklyn, New York 11201
By: Jason P. Peck, Special AUSA

**HURLEY, Senior District Judge:**

       Plaintiff Karen A. Almestica ("plaintiff") commenced this action pursuant to 42 U.S.C. §

405(g) seeking judicial review of a final decision by the Commissioner of Social Security (the

"Commissioner" or "defendant") which denied her claim for disability benefits. Presently before

the Court is plaintiff's motion and defendant's cross-motion for judgment on the pleadings

pursuant to Federal Rule of Civil Procedure 12(c). For the reason discussed below, plaintiff's

motion is denied and defendant's motion is granted.

## I.    Procedural Background

Plaintiff filed an application for disability benefits on February 21, 2013, alleging an onset of disability date of October 6, 2012. (Tr. 144-45)[1] Her application was denied and she then requested a hearing. (Tr. 79-82, 85-86.) On January 12, 2015, plaintiff appeared and testified at a hearing before ALJ April M. Wexler. (Tr. 30-67.) By Notice of Decision-Unfavorable, dated March 4, 2015, ALJ Wexler denied plaintiff's claims for disability. (Tr. 7-23.) Plaintiff appealed that decision and on September 14, 2015, the Appeals Council denied review. (Tr. 1-6.) The ALJ's decision therefore became the Commissioner's final decision. This action followed.

## II.    Factual Background

### A.    Non-Medical Evidence

Plaintiff was born in 1954 and is a high school graduate. (Tr. 33-34.) Her past relevant work is as a telephone operator and a casino attendant. (Tr. 64.) She lives in a house with her mother and sisters. (Tr. 34, 43-44.) Although she has a license, she no longer drives. (Tr. 34, 176-77.) Her sister has to assist her with bathing and dressing. She testified that it is sometimes difficult to comb her hair due to swelling of her right hand. (Tr. 42-43.) She stated she does nothing all day and only goes outside for doctor's appointments and "at least once a week for fresh air." (Tr. 44-45.) She can manage her money and is able to shop once a month for clothing and food but is unable to do any cooking or cleaning. (Tr. 43, 177, 183.) She is a breast cancer survivor (with residual pain and weakness in her right upper extremity) with a history of a lumpectomy in her right breast. (Tr. 43, 57, 163, 181-82.)

---

[1] "Tr." refers to the administrative record filed in this case.

Plaintiff testified that she stopped working on October 6, 2012 because of the pain and other symptoms associated with her neuropathy and sciatica. (Tr. 34-36.) The pain goes from her back down to her right leg. Both her feet are numb. She has pain in both knees but it is worse on the right. (Tr. 36, 52) She gets dizzy when she bends over. She reported having fainting spells once or twice a week but had not had one for at least a month at the time of the hearing. (Tr. 46-49.) She estimated that she can sit for 15 to 20 minutes at a time, stand for 15 minutes and walk less than one block. She cannot bend or stoop. (Tr. 54-55.) She testified she has frequent headaches and frequent problems concentrating. (Tr. 55-58.) Her pain causes her not to be able to sleep at night and even with taking Ambien she still does not "sleep a whole night through." (Tr. 55-56.) She has no problem getting along with family, friends or others. (Tr. 178.)

Plaintiff testified that she underwent no medical treatment for her dizziness/fainting other than taking her diabetes medication. (Tr. 49.) In addition to wearing a Lidocaine patch, she takes narcotic pain medication approximately three times a day for back pain which helps control the pain but makes her drowsy. She has not had any injections for her back pain and no surgery has been recommended. (Tr. 39.) She stated she was attempting to start physical therapy but has difficulty with transportation. (Tr. 39-40.) She takes Lyrica for neuropathy. (Tr. 37-38, 40-42.) She treats her diabetes with diet, oral medication, and insulin injections but her blood sugar is still high. (Tr.37-38, 49-51, 58.) She also takes medication to control her blood pressure. (Tr. 38.) Although she went to the emergency room "maybe twice" in the past two years due to uncontrolled blood pressure caused by a "slip up" in taking her medication, she has not been there recently as her blood pressure is successfully stabilized by medication. (Tr. 38-39.) She also testified that she has headaches "sometimes every day;" they last "[a]while" and she takes

Oxycodone because Tylenol doesn't work. (Tr. 58-59.)

**B.    Medical Evidence - Treating Sources**

1.    <u>Mather Memorial Hospital</u>

Plaintiff was treated in the Emergency Room of Mather Memorial Hospital on April 7, 2012 for complaints of headache, neck pain, and dizziness with no numbness, tingling, weakness or fever; she ambulated without assistance. She appeared well developed, well groomed, and well nourished. No neurological deficits or spinal pain was noted. Her blood pressure ranged from 137/70 to 155/78 and her "Whole Blood Glucose" level was 297 mg/dl. A CT scan of the brain was performed, with the following results:

> No acute intracerebral hemorrhage seen. Old infarct involving anterior limb of the left internal capsule and left basal ganglia with ex vacuo dilation of the frontal horn of the left lateral ventricle as above. Hypodensity also seen in the left temporal lobe, age-indeterminate. Recommend comparison clinical exam and/or follow-up MRI.

An EKG was normal. She was treated with Tylenol, aspirin, insulin, a nonsteroidal anti-inflammatory drug and a saline IV. Plaintiff was diagnosed with "Acute Headache, Dizziness-Vertigo" and discharged in stable condition. (Tr. 229-50.)

2.    <u>Stony Brook Medicine</u>

Records dated from December 3, 2012 to December 5, 2013 from Stony Brook Medicine show plaintiff received prior treatment for breast cancer including post-operative and radiation changes to the right breast, with no significant masses in either breast. Progress notes from March and December 2013, state plaintiff had no complaints. (Tr. 251-57, 313-15.)

### 3. East End Endocrine Associates

On April 2, 2013, plaintiff was seen to establish treatment for diabetes. She complained of dizziness upon standing, but denied loss of consciousness, blurred vision, numbness and burning pain in her feet. She reported "exercising/incorporating physical activity into lifestyle." Her physical exam was normal. She was diagnosed with uncontrolled diabetes mellitus with neurological manifestations. She was advised to increase her dose of gabapentin. (Tr. 261-64.) At a follow-up examination on June 12, 2013, she denied exercising/incorporating physical activity into her lifestyle, anxiety, and loss of consciousness. She reported dizziness, numbness (feet) and burning pain (feet). On examination, no significant changes were documented. (Tr. 259-60.)

### 4. Mark Koenig, D.O.

Plaintiff was first seen by Dr. Koenig on February 7, 2013, to establish treatment for a history of hypertension, type 2 diabetes mellitus, and diabetic neuropathy. Her medications included Novolog, Metformin, HCTZ, and Gabapentin. She was diagnosed with hypertension, uncontrolled type 2 diabetes mellitus, and diabetic neuropathy. Updated blood work was requested. On February 28, 2013, Ms. Almestica reported she had increased her Novalog and Metformin. On April 4, 2013, Ms. Almestica complained of lower back pain radiating to the right groin for which she took ibuprofen "which helps somewhat." (Tr. 281). An examination by Dr. Koenig revealed lumbar spine tenderness and decreased range of motion. He diagnosed sciatica and prescribed Tramadol. Dr. Koenig's notes reflect that plaintiff did not keep appointments in August, September and October 2013. (Tr. 279-81.)

### 5. Norman Pflaster, M.D. - Neurologist

Dr. Pflaster began treating plaintiff on October 11, 2013 for sciatica. Plaintiff reported to

the doctor that the pain radiated from the lower back to both calves, the right foot, and the right thigh. These symptoms were complicated by neuropathy. She also reported decreased activity and irritability, as well as problems with her gait. An examination revealed severe bilateral tenderness of the ribs, chest wall, hips, and hamstrings, stocking hypoesthesias, an antalgic gait, and absent Achilles reflex. Dr. Pflaster diagnosed chronic pain in the thoracic spine, chronic hip pain, chronic shoulder pain, idiopathic peripheral neuropathy, and chronic myalgias and myositis. (Tr. 349-53.)

An MRI of the lumbar spine on October 15, 2013 revealed mild levoscoliosis, a slight decrease in the disc height at L4-5 consistent with mild degenerative disc disease, evidence of mild degenerative disc disease at L3-4 and L5-S1, a small central disc herniation at L4-5 causing mild mass effect on the thecal sac, moderate degenerative changes of the facet joints at L4-5 with evidence of mild to moderate bilateral foraminal stenosis, and a minimal bulge at L5-S. Dr. Pflaster reviewed these MRI findings at a follow-up on February 10, 2014 and recommended physical therapy. (Tr. 344, 357-58.)

Dr. Pflaster completed a Multiple Impairment Questionnaire on February 11, 2014. He diagnosed severe degenerative joint disease, diabetic neuropathy, and deconditioning. Clinical findings included a right knee joint effusion and, referencing the MRI of the lumbar spine, degenerative disk disease with L4-5 disc herniation. He indicated that plaintiff's primary symptoms were pain in the right lower extremity greater than the left lower extremity and indicated that the pain was "constant," rating it 9/10, and not completely relieved by medication. He rated her fatigue as moderate, 4 on a 10-point scale. He stated her prognosis was guarded and noted that plaintiff used a cane for a few steps and then used a wheelchair. (Tr. 291-93.)

Dr. Pflaster opined Ms. Almestica is able to sit 1 hour total and stand/walk less than 1 hour in an 8-hour workday. She could occasionally lift and carry 5 pounds, but never more. She also had significant limitations performing repetitive reaching, handling, fingering, and lifting due to low back symptoms. Dr. Pflaster assessed plaintiff was markedly limited (defined as effectively precluded) from using the arms/hands for reaching and is moderately limited (defined as significantly limited but not precluded) from grasping, turning, and twisting objects. Her pain, fatigue, or other symptoms are frequently severe enough to interfere with attention and concentration. Dr. Pflaster opined plaintiff is not a malingerer, would required unscheduled breaks to rest every 10 to 15 minutes for 45 minutes each time and would miss work, on average, more than three times a month (Tr. 293-97).

On May 23, 2014, plaintiff saw Dr. Pflaster and reported continued sciatica primarily in the right hamstring. On examination, range of motion was normal for all four extremities, hand/neck and spine. There were no motor or sensory deficits. Balance, gait and coordination were "intact" and deep tendon reflexes were preserved. The doctor described her condition as "stable or slightly improved," recommended continued physical therapy, and prescribed Pamelor and Vicodin. (Tr. 339-343.)

On November 26, 2014, plaintiff reported ongoing sciatica symptoms. Her examination results were unchanged from the May 2014 examination. Dr. Pflaster recommended continuing medications and physical therapy. (Tr. 338.)

6.     Rohan Perera, M.D. - Cardiologist

Plaintiff was evaluated by Dr. Perera on October 29, 2013 for syncope (fainting). According to Dr. Perera's noted, plaintiff described episodes occurring twice a month, usually

when sitting up or standing. On examination, Dr. Perera noted no abnormalities of plaintiff's neck, lungs, heart, abdomen, extremities, pulses, or skin and found that plaintiff's gait was "stable." He stated that an ECG showed a right bundle branch block. He diagnosed vasovagal episode and syncope. (Tr. 322-23.)

At a follow-up examination on December 13, 2013, Dr. Perera, noted "no change in review of systems since 10/29/2013" and diagnosed syncope and recommended that plaintiff reduce Hyzaar, stop Losartan, and consider an insulin pump. (Tr. 320.)

On March 14, 2014, plaintiff saw Dr. Perera, who noted no irregularities after his examination of plaintiff's neck, chest, lungs, heart, abdomen, extremities and pulses. The doctor's note state "stress SOPECT was non ischemic and echo showed normal LV fx. No orthostatis by exam in the office today." He diagnosed vasovagal episode and syncope and recommended a further reduction in her Losartan dosage. (Tr. 318.) Dr. Perera then completed a Cardiac Impairment Questionnaire. He diagnosed diabetes mellitus and diabetic neuropathy citing shortness of breath, fatigue, weakness and dizziness/syncope as the clinical findings supporting that diagnosis. He stated plaintiff's prognosis was guarded, with her primary symptoms of lightheadedness and fainting spells. Dr. Perera indicated plaintiff's symptoms and functional limitations were reasonably consistent with her physical and/or emotional impairments as described. Dr. Perera opined that her symptoms would likely increase if she was placed in a competitive work environment. Dr. Perera assessed plaintiff could sit for 0-1 hour and stand/walk for 0-1 hour (each) in an eight hour day, never lift, and only occasionally carry 0-5 pounds. He stated plaintiff would experience "good" and "bad" days, was not a malingerer, and had psychological limitations (incapable of even low-stress work). (Tr. 307-12.)

On May 13, 2014, plaintiff reported to Dr. Perera that she had no further episodes of syncope and denied any associated signs or symptoms of syncope, angina, dyspnea, PND, orthopnea, palpitations or pedal edema. (Tr. 316.)

       7.    Robin DaCosta, M.D.

On February 4, 2014 Dr. DaCosta completed a multiple impairment questionnaire listing a treatment frequency of "every 1-2 months" from October 1, 2013 to February 4, 2014. However, none of Dr. DaCosta's treatment notes are included in the certified administrative record. She listed her diagnosis as syncope, uncontrolled diabetes mellitus, hypertension, chronic headaches, history of a stroke (cerebral vascular accident or "CVA"), diabetic neuropathy, hand and leg pain, and possible arthritis. Clinical findings included a history of syncope, pain in the hands and legs, right foot tenderness, and left hand swelling. Dr. DaCosta also cited laboratory blood testing results (unreadable) and "MRI brain 11/2013 - old left basal ganglia infarct" to support her assessment. She listed plaintiff's primary symptoms as syncope, dizziness, pain in the left hand, pain in the right foot, bilateral knee pain, and lower back pain with prolonged sitting. She rated plaintiff's pain as severe, 10 on a 10-point scale, and fatigue as moderately severe, 8 on a 10-point scale. Dr. DaCosta stated plaintiff's prognosis was poor. She opined that plaintiff was able to sit 4 to 5 hours total and stand/walk 1 hour total in an 8-hour workday and when sitting, needed to get up and move around every 2 hours for 5 to 10 minutes before sitting again. Dr. Da Costa found plaintiff could frequently lift/carry 5 pounds and occasionally 10 pounds and had significant limitations performing repetitive reaching, handling, fingering, and lifting due to chronic hand pain. She assessed plaintiff was markedly limited from using the left upper extremity and moderately limited from using the right upper extremity for grasping,

9

turning, and twisting objects, performing fine manipulations, and reaching. Dr. DaCosta opined

that her pain, fatigue,

or other symptoms were frequently severe enough to interfere with attention and concentration

and agreed with the other treating sources that plaintiff is not a malingerer. She has good days

and bad days, but would be absent from work, on average, more than three times a month due to

her impairments or treatment. (Tr. 299-306.)

### C.    Consultative Medical Evidence

1.    A. Manyam, M.D.

Dr. Manyam performed a consultative internal medicine examination on June 27, 2013.

The doctor noted plaintiff's medical history, medications and subjective complaints. The notes

state that (1) plaintiff described her back pain as severe for the "last six months" although she

received complete relief from the strong medicines she took and (2) analgesic pain medications

and rest relieved the right chest wall pain plaintiff experienced when doing any muscular activity

like moving furniture or lifting weight.  Regarding plaintiff's activities of daily living, Dr.

Manyam noted that plaintiff reported she cooks "but not much" because she cannot stand too

long and her inability to stand for too long also prevents her from cleaning, doing laundry and

shopping. Plaintiff also stated that she needs assistance to shower, bathe and dress; Dr. Manyam

noted, however, that she dressed herself after the examination without any help.  (Tr. 271-72.)

On examination, plaintiff was 5' 5" tall and weighed 200 pounds. Her blood pressure was

140/90; she had not taken her blood pressure medication that morning and was "asymptomatic at

this time." (Tr. 273.) Plaintiff could walk on her heels and toes without difficulty and perform a

full squat. She had a normal stance. She needed no help changing for the exam or getting on and

off the examination table. She was able to rise from a chair without difficulty. She used a self-prescribed assistive device (cane) when walking to help with her back pain, which Dr. Manyam opined was not medically necessary. Plaintiff walked very slowly with or without the cane, with very small steps and complained of pain. Her cardiovascular examination was normal. (Tr. 273-74.)

Plaintiff's cervical spine showed full flexion, extension, lateral flexion (bilaterally), and full rotary movement (bilaterally). She had no scoliosis, kyphosis, or abnormality in her thoracic spine. Her lumbar spine showed full flexion, extension, lateral flexion (bilaterally), and full rotary movement (bilaterally). Straight leg raises were negative (bilaterally). She had full range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles. Her joints were stable and non-tender, with no evident subluxations, contractures, ankylosis, or thickening. She had localized tenderness in the left buttock area and some tenderness in the right buttock area. She stated that the pain moved across and mostly radiated towards the right, which Dr. Manyam noted was "only localized tenderness." She had no redness, heat, swelling, or effusion. She had physiologic and equal deep tendon reflexes and full (5/5) strength in the upper and lower extremities, with no sensory deficit, edema, or atrophy noted. She had intact hand and finger dexterity. Her grip strength was full (bilaterally). X-rays of the thoracic and lumbar spine showed degenerative changes. (Tr. 274, 276-77.)

Dr. Manyam diagnosed: (1) low back pain with right sciatica, musculoskeletal in origin; (2) right chest wall pain, musculoskeletal in origin; (3) status post carcinoma of the right breast, with lumpectomy and radiation, presently on chemotherapy, and currently cancer free; (4) diabetes mellitus type 2, insulin dependent, and diabetic neuropathy, on medications, and; (5)

11

hypertension. Dr. Manyam assigned a "fair" prognosis and assessed plaintiff had a

"mild limitation to prolonged walking, climbing stairs, pushing, pulling, lifting, and carrying

weights." Tr. 275.

## DISCUSSION

### I.     Standard of Review

#### A.     Review of the ALJ's Decision

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing." 42

U.S.C. § 405(g). The Court may set aside a determination of the ALJ only if it is "based upon

legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d

Cir. 1999) (internal quotation marks and citation omitted). "Substantial evidence is 'more than a

mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to

support a conclusion.'" *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the findings of the

Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. §

405(g), and thus, the reviewing court does not decide the case de novo. *Halloran v. Barnhart*,

362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted). The only issue

before the Court is whether the ALJ's finding that plaintiff was not eligible for disability benefits

was "based on legal error or is not supported by substantial evidence." *Rosa*, 168 F.3d at 77.

## B.     Eligibility for Disability Benefits

### 1.     *The Five-Step Analysis of Disability Claims*

To be eligible for disability benefits under the Social Security Act (the "SSA"), a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  *Id*. § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims.  See 20 C.F.R. § 404.1520.  This Circuit has described the procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

### C. The Treating Physician Rule

Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at 78-79. The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts." *Hallora*n, 362 F.3d at 32; *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion. *Id*. § 404.1527(d)(2)(I-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32. Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so. 20 C.F.R. § 404.1527(d)(2).

In addition, it is clearly stated law in the Second Circuit that "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (emphasis added); *see also Rivera v. Sullivan*, 923 F.2d 964 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician not given sufficient weight with regard to degenerative condition).

Finally, the ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record. *Rosa*, 168 F.3d at 79. "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,'" even if the claimant is represented by counsel. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Butts v. Barhart,* 388 F.3d 377, 386 (2d Cir. 2004) ("'It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits.'") (quoting *Seavey v. Barnhart*, 276 F.3d 1, 8 (1st Cir. 2001)), amended on other grounds on rehearing, 416 F.3d 101 (2d Cir. 2005). Specifically, this duty requires the Commissioner to "seek additional evidence or clarification" from the claimant's treating sources when their reports "contain[ ] a conflict or ambiguity that must be resolved" or their reports are "inadequate for [the Commissioner] to determine whether [claimant] is disabled." 20 C.F.R. §§ 404.1512(e), (e)(1). The Commissioner "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from

[the claimant's] medical source." Id. § 404.1512(e)(1). The only exception to this requirement is where the Commissioner "know[s] from past experience that the source either cannot or will not provide the necessary findings." Id. § 404.1512(e)(2). If the information obtained from the claimant's medical sources is not sufficient to make a disability determination, or the Commissioner is unable to seek clarification from treating sources, the Commissioner will ask the claimant to attend one or more consultative evaluations. *Id*. § 404.1512(f).

## II.    The ALJ's Decision

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ found that plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 6, 2012 (Tr. 12.) Proceeding to step two, the ALJ determined that plaintiff has the following severe impairment: back impairment, diabetes mellitus, neuropathy and vasovagal syncope. (Tr. 12-13.) At step three, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13-14.) Specifically, the ALJ found that plaintiff did not establish that she met or equaled the criteria of Listing 1.04 (disorders of the spine) because she failed to provide medical evidence showing the existence of a "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture" which resulted "in the compromise of a nerve root or the spinal cord." Further, plaintiff did not establish that she met or equaled the criteria of Listing 9.00 (Endocrine Disorders - Adult) as she failed to provide medical showing significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, gait and station, and diabetic neuropathy with acidosis occurring at

least on the average of once every two months documented by appropriate blood chemical tests or retinitis proliferans causing a severe visual impairment. Prior to proceeding to the next steps, ALJ Wexler found that plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) in that she can occasionally lift ten pounds; push/pull without limitation; sit for approximately six hours and stand or walk for approximately two hours with normal breaks in an eight hour work day; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; only occasionally balance and stoop; never kneel, crouch or crawl; and needs to use an assistive device to ambulate. (Tr. 14-18.) At step four, the ALJ determined that plaintiff was capable of performing past relevant work as a telephone operator. The ALJ therefore found that plaintiff was not disabled.

### III. Summary of Arguments

Plaintiff contends that the Commissioner's decision should be vacated because the ALJ failed to properly weigh the medical opinion evidence. (Pl. Mem. in Supp. at 9-13.) Specifically, plaintiff maintains that the reasons the ALJ provided for not assigning controlling weight to the medical assessments from Drs. Pflaster, DaCosta and Perera were unsupported by the record; the ALJ did not utilize the required criteria when analyzing the treating assessments; and the ALJ inappropriately relied on Dr. Manyam's medical assessment. Plaintiff also argues that the ALJ failed to properly evaluate her credibility. (*Id*. at 14-16.)

Defendant argues that substantial evidence supports the ALJ's decision. (Def. Mem. 12-16.) Additionally, defendant responds that the ALJ properly weighed the medical opinion evidence (*id.* at 16-21) and properly evaluated plaintiff's credibility (*id.* at 21-24).

**IV.    Application of Governing Law to the Present Facts**

After a careful review of the record in this case, the Court concludes that the ALJ's conclusions are supported by substantial evidence and she correctly applied the relevant legal standards.

**A.    The ALJ Properly Weighed the Medical Opinion Evidence**

In her decision, the ALJ gave "little weight" to the opinions of Drs. Perera, DaCosta and Pflaster. In support of the assessed weight given to Dr. Pflaster's opinion, the ALJ wrote that he "has only treated the claimant every four months since October 2013, there are minimal treating notes, and his opinion is not supported by or consistent with diagnostic testing showing only mild findings, clinical findings contained in the record or the extremely conservative treatment." (Tr. 16.) Considering Dr. DaCosta's two assessments, the ALJ assigned them little weight as "not supported by any treatment notes and not consistent with diagnostic testing and clinical findings contained in the record." (Tr. 16-17.)  Dr. Perera's opinion was given little weight "as it is not supported by treatment notes; and is not consistent with diagnostic testing in Exhibit 10F and clinical findings contained in the record. Specifically, in Exhibit 10F dated May 13, 2014 testing shows a normal nonischemic study with normal L V systolic function and normal echocardiogram for the claimant's age." (Tr. at 16.)

The reasons cited by the ALJ for not giving controlling weight to the opinion of these three doctors are amply supported by the record. For example, Dr. Pflaster's examination of plaintiff showed normal results including normal range of motion for all four extremities, head/neck and spine. Indeed, Dr. Pflaster's neurological examination showed no motor or sensory deficits, normal fine motor skills, and balance, gait and coordination all "intact." (Tr.

337.) The MRI of the lumber spine showed only mild levoscoliosis, a slight decrease in the disc height at L4-5 consistent with mild degenerative disc disease, evidence of mild degenerative disc disease at L3-4 and L5-S1, a small central disc herniation at L4-5 causing mild mass effect on the thecal sac, moderate degenerative changes of the facet joints at L4-5 with evidence of mild to moderate bilateral foraminal stenosis, and a minimal bulge at L5-S1. (Tr. 357-58.) The October 2013 EMG/Nerve Conduction study showed normal results and "no electrophysiologic evidence for right lumbosacral radiculopathy." (Tr. 354-56.) Moreover, Dr. Pflaster had only seen plaintiff twice prior to his medical assessment. At no time did he recommend injections, only physical therapy. While Dr. Pflaster stated in his assessment that his opinion was based on evidence of a right knee effusion and MRI finding of the lumbar spine, the MRI results and his treatment notes do not support his opinion. *See Chichocki v. Astrue*, 534 Fed. Appx. 71, 75 (2d Cir. 2013) (ALJ was not required to afford treating physician's opinion controlling weight as his medical source statement conflicted with his own treatment notes.)

Although Dr. Perera based his opinions on evidence of shortness of breath, fatigue, weakness and dizziness/syncope, his notes for May 13, 2014 stated that plaintiff reported no further syncope from her vasovagal episode and denied any associated signs or symptoms as well as any signs or symptoms of syncope, pedal edema, angina, dyspenea, or palpitations, and her blood pressure was under control at 120/70. He also observed that plaintiff was in "no apparent distress" and the results of a recent stress test and echocardiogram were normal.

It is also notable that the examination results from East End Endocrine Associates were normal except for poor microfilament sensation.

The foregoing results support the ALJ's assessment that the opinions of Drs. Perera,

Pflaster and DaCosta were entitled to little weight. *See, e.g., Rosier v. Colvin*, 586 Fed. Appx. at 758 (ALJ properly rejected treating physician's opinion where other substantial evidence in the record was inconsistent with treating physician's opinion). Although the treating physician rule generally requires that the treating physician's opinion be accorded controlling weight, this does not apply when, as here, the treating physician has issued opinions inconsistent with other substantial evidence in the record. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Despite Plaintiff's belief otherwise, the record as a whole supports the ALJ's application of the § 404.1527 factors to afford little weight to assessments of Drs. Perera, Pflaster and DaCosta. The ALJ carefully considered the treating physician rule and the requisite factors, and gave record-based reasoning for her conclusion.

Nor was the ALJ's assessment of Dr. Manyam's consultative opinion as entitled to "some weight" erroneous. Dr. Manyam, similar to Dr. Perera, observed that plaintiff was in no acute distress. And like Dr. Pflaster's examination, Dr. Manyam's examination revealed full range of motion. Plaintiff was able to walk on her heels and toes without difficulty for Dr. Manyam and could perform a full squat, had a normal stance, rose from the chair without difficulty and was able to change for the exam and get on and off the exam table without help. She had full strength in the upper and lower extremities and intact finger and hand dexterity. Her joints were stable and non-tender. She had localized tenderness in the left buttock area and some tenderness in the right buttock area. X-rays of the thoracic and lumbar spine showed only degenerative changes. Plaintiff reported to Dr. Manyam that medication provided "complete relief" of her back pain and that her chest pain goes away with analgesic pain medications and with rest. Dr. Manyam's conclusions are supported by his examination of the plaintiff, as well as other record evidence

such as the MRI, normal stress test and echocardiogram, the examination of East End Endocrine

Associates, and Dr. Pflaster's neurological examination. *See Punch v. Barnhart*, 2002 WL

1033543, at *11–13 (S.D.N.Y. May 21, 2002) (where ALJ credited the opinion of a non-treating

medical expert over that of a treating physician for the stated reasons that the treating physician's

opinion was "not well supported by medically acceptable clinical and laboratory diagnostic

techniques" and was "inconsistent with the other substantial evidence" in the record, the ALJ was

"following the treating physician regulation rather than ignoring it," as the plaintiff claimed).

### B.      Plaintiff's Credibility was Properly Evaluated

Social Security regulations require an ALJ to consider a claimant's subjective testimony

regarding his symptoms when analyzing whether he is disabled. *See* 20 C.F.R. § 404.1529(a)

(2011). In order to evaluate a claimant's subjective testimony regarding his symptoms, first, the

ALJ must determine "whether there is an underlying medically determinable physical or mental

impairment . . . that could reasonably be expected to produce" the claimed symptoms. *See* SSR

96–7p, 1996 WL 374186, at *2 (July 2, 1996). Second, the ALJ "must evaluate the intensity,

persistence, and limiting effects of the individual's symptoms to determine the extent to which

the symptoms limit the individual's ability to do basic work activities." *Id*. Moreover, if a

claimant's subjective evidence of pain is supported by objective medical evidence, it is entitled to

"great weight." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir.1992) (internal quotation

marks omitted).

If a claimant's symptoms suggest a greater severity of impairment than can be

demonstrated by the objective medical evidence, additional factors must be considered. *See* 20

C.F.R. § 404.1529(c)(3). These include daily activities, the location, duration, frequency and

intensity of symptoms, the type, effectiveness and side effects of medication, and other treatment or measures to relieve those symptoms.  *Id*.  An ALJ need not, however, explicitly recite the seven relevant factors. *See Chichocki v. Astrue*, 534 Fed. Appx. 71, 75 (2d Cir. 2013). "The ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight.' " *Id.*  (quoting SSR 96–7p, 1996 WL 374186, at *2).  A single conclusory statement that the claimant is not credible is not sufficient; the evidence of record must "permit [a court] to glean the rationale of an ALJ's decision." *Id.* (internal quotation marks omitted.)

Here, after reciting the seven relevant factors, the ALJ wrote:

> The course of treatment does not support the claimant's allegation of disability. The record shows that the claimant only had conservative treatment for her alleged conditions and did not require any surgical intervention, physical therapy or injections. In addition, diagnostic testing has relatively benign findings and an EMG test in October 2013 was negative. . . . The residual functional capacity outlined above accounts for the claimant's credible testimony supported by medical evidence of record, regarding vocational limitations that her condition would place on her. . . . The residual functional capacity accounts for the vocational limitations that would be placed upon the claimant based on her medically determinable impairments. Specifically, the claimant has provided evidence and testimony that she suffers from a back impairment, diabetes mellitus, neuropathy and vasovagal syncope. The sedentary exertional level of residual functional capacity accounts for the limitations that those conditions would place upon her. The lifting requirement of only 10 pounds occasionally takes into consideration issues she would have because of her conditions. The only occasional balancing and stooping, and never kneeling, crouching or crawling also gives credence to her back issues, as well as her neuropathic pain. The

> restriction against ladders, ropes or scaffolds also takes into
> consideration her limitations imposed upon her by impairments. In
> addition, the ability to use an assistive device for ambulation
> credits her testimony in this regard.

(Tr. 18.)

Notwithstanding plaintiff's assertions to the contrary, the ALJ sufficiently explained her credibility determination, basing it on the conservative treatment received by plaintiff, i.e. medications as opposed to surgical intervention, injections and physical therapy, as well as the benign results of diagnostic testing.

"It is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses.'" *Cichoki v. Astrue*, 534 F. Appx. 71, 75 (2d Cir. 2013) (summary order) (quoting *Carroll v. Secy. of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The ALJ properly identified specific record-based reasons for her credibility findings and the record evidence permits the Court "to glean the rationale of the ALJ's decision. *Id.*

## CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the pleadings is denied, defendant's cross-motion is granted, and the decision of the Commissioner is affirmed. The Clerk of the Court is directed to enter judgment in favor of defendant and to close this case.

Dated: Central Islip, New York
     September 8, 2016

/s/  Denis R. Hurley
Denis R. Hurley
United States District Judge